The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right, be seated, please. Next case we're going to hear is Appalachian Power Company v. FERC, and I guess we'll hear from Mr. Kaiser first. Thank you, Your Honor, and I've reserved five minutes for rebuttal. May it please the Court, William Kaiser on behalf of the petitioner. This is a contract case. The question before this Court is whether FERC's interpretation of three full requirement energy service contracts to allow the use of battery storage to reduce end-use customers' energy consumption violates the terms and conditions of those contracts and therefore is arbitrary and capricious. We believe it is. In reaching its decision, FERC ignores how the batteries will be used and how that is contrary to the symmetry that a full requirements electric service contract requires. So I'm going to talk about the contracts. There's three contracts at issue here. I'm going to focus on the Radford contract, which starts at JA87. For purposes of discussion, the contracts are virtually identical. There are a couple of minor differences. If you ask questions about them, I can point them out, but I just feel as we're going to be focusing on the contracts, it's easier to walk through the record and focus on one particular contract. Well, the Virginia Tech contract clearly has that language in it. Where is that language in those other contracts? The Virginia Tech contract explicitly identifies battery storage as existing generation. The other contracts don't discuss battery storage explicitly, but that doesn't mean that the contracts themselves don't contemplate the behavior that the battery storage allows and prohibits it under the terms of the contract. And doesn't this dispute turn on the term generation? I would argue that in FERC's mind it does. I would argue that it doesn't. So I would argue that even if you agree with FERC, which we disagree with, and we can talk about that, but the terms of the contract itself still disallow the use of batteries in the way that the customers plan to do so. And I can walk you through the contract and explain that to you. Following up a little bit on Judge Floyd's question, it seems to me, and you can tell me if I'm wrong, is it prohibits the customer from using constructed or purchased generation resources. Is that the language? That's in 3.1C. In no time, customers shall use newly constructed generation resources or purchased generation resources or new power purchase agreements. That's the prohibition that you have to rely on or interpret. That's what FERC relied on. That's what FERC relied on. But I would argue that FERC ignored other provisions of the contract. Your arguments on the others are the consequences to go to what the intent of that is. But I'd like to focus just on those words. And I can tell you the process I went through, and then you can tell me whether this is right or wrong. The FERC opinion treats the batteries as storage, which doesn't mean new generation. It means storing existing, which might seem to be in favor of FERC's interpretation, if that's so. So I started considering what a battery is. And I won't tell you the whole process I went through, but it seemed to me that in this case, the battery is filled, so to speak, charged by Appalachian Power Electricity, and the battery is discharged on the customer's line. The difference is that the battery is charged during off hours, and then it is discharged during peak hours. And so it lowers the peak. So it has the consequence of affecting the allocation of costs and your plant, which I understand fully in your argument. But this prohibition doesn't seem to prohibit a storage facility as distinct from a generating facility. In other words, this is a little bit like catching water in a bucket during the rainstorm and saving it for the dry period. And so the electricity is stored in the battery by charging it during off hours, and then it is discharged during peak hours. Now, it would seem to me that that would not, in that context, prohibit the conclusion reached by FERC that this was a storage facility, and a storage facility is not a generating facility. Now, your argument is that that changes the allocation of your plant because it's designed for peak hours. And that's the allocation of costs. And it might be that you could argue on that issue that you could impute peak hours without the battery to try to generate some allocation of costs. But that was not decided by FERC and is left open explicitly, the allocation of costs. The only question is whether the battery itself is prohibited. And to determine that, I looked at that clause, newly constructed or purchased generation resources. And FERC concluded that that does not prohibit batteries because it's not new generating resources. It's using Appalachian's power to charge, refill it, and then discharge during peak. That's where I sort of looked at this, and I'm happy to have you correct anything because I'm not locked into anything.  And let me, there's a lot there, so if I kind of go in pieces here. I think one thing that we have to focus on is a timing aspect here. And so I think you focused on that in your question because, as you pointed out, when the batteries are used, right, they're going to be charging the batteries at off time and using them during peak time. And it's going to end up reducing your ability to recover those costs. And the capital investment made by the company in order to serve. There's no question about that. So my whole point is the prohibition that FERC relied on is generation resources, but they explicitly left open the allocation issue. And it seems to me you could make a very powerful argument to FERC that if a customer uses a battery, we're now going to impute usage at the peak time without the batteries in order to allocate costs. That's a good argument you could make because what they are doing is reducing the peak levels, which reduces your ability to demand cost allocation. Sure. So two things. Let me get to your second point first because the other argument we did make at FERC is, in addition to the allocation for these customers and being able to change that under the agreement, there's also the concern about cost causation and the fact that the way that this works is that when they shave their peak, and I think there's some evidence in the record, it's in the rehearing, that it's going to reduce their, these are estimates because we don't quite know how they're going to use them. I think you make a very persuasive argument. The effect, it's going to reduce the peaks. And as a matter of fact, that's the intent of the battery. Correct. And it's conservation of energy. So you're affected because it reduces your ability to recover plant costs and so forth. But, again, isn't that just an allocation and not whether battery is prohibited? Well, I want to turn you to 3.1a because I think that's an important provision to focus on because it informs what's going on in 3.1c, which we're talking about. So when we're talking about 3.1a, that says during the delivery period, company shall sell and customer, in this case the city, shall exclusively receive and purchase full requirements electric service sufficient to serve customer's retail load. So that creates an obligation on behalf of the company. They have to sell and deliver. And on the customer, they have to receive and purchase two things, full requirement electric service sufficient to serve retail load. And so when you look at the definition, and these are important for this determination, of full requirements electric service, that's the supply of firm energy. So now we're talking about energy, not just generation, to be provided by the company to the city as may fluctuate in real time. So that's focusing. They did purchase it from APCO, from Appalachian Power, during off hours and stored it in a battery and then took, theoretically, the Appalachian Power, the energy that's in the battery, and distributed it during peak hours. So it was a timing issue. It's not a new source issue. And it's full resources because they still used Appalachian Power completely, energy. The problem for you, and I think it's a legitimate problem, is it adjusts your cost structure, which still should be addressed. But I don't know if you can blur the two. Well, and I would say, like, as I mentioned, right, the full requirements electric service is talking about the energy supplied in real time to serve the customer's retail load. And when we're talking about retail load, we're talking about end-use customers here, right? So the definition of retail load is energy to supply the city's end-use customer, not the city, which is taking that power to be stored in the battery, but the end-use customer. My point is I understand that, but they're still using Appalachian Power. You're suggesting that at the peak time they're not using all Appalachian Power. They're using battery power too. But the battery power is stored Appalachian Power. Right. It is stored Appalachian Power. It's a timing issue which affects the cost. It is a timing issue, and that's important, right, for the many reasons you just talked about. So it's a timing issue that's laid out in 3.1a because what 3.1a requires is the company to sell and the buyer to receive exclusively receive and purchase from Appalachian Power the power necessary to serve their end-use customers in real time. So when they're substituting the battery in there to use that, even though they took that battery ahead of time, took that power ahead of time, they're still using that power to serve their customers. Yeah, but that power is deferred Appalachian Power. Right, but it's the time when that power is used. And 3.1a is important here because it establishes that symmetry, which I talked about, which lines up what Appalachian Power must do, which is provide all the power necessary to serve the end-use customers at the time of their peak need. So if the cities are using the batteries to supply those end-use customers at the time, in real time, then in real time they're not taking that power from Appalachian Power. And that's important. They are. No, because it's... They're taking it from the battery, but it's Appalachian Power's energy. Right, but the importance here is going back to why that provision is important and why that timing provision is important. It's very important for the allocation of costs. Correct. But it may not be important for determining whether it is an independent generating force or is part of Appalachian's. It's a full requirements contract. All the power that the customer is going to use has to come from Appalachian Power. Right. Okay, so Appalachian Power supplied all the energy that's going to be used. What they have done is they've managed that energy with a battery by charging it during off hours and discharging it. They're delayed the use of that energy. And so the way FERC addressed this is they call that storage. And that took me back for a while because I know when I turn on my flashlight, my flashlight is producing energy to light up the thing. But that only takes into account the discharge of the battery. And, of course, the charge of the battery came from Apco's energy. And what you're saying is that your rates and your facilities costs are determined on a timing issue. Correct. And the full needs at the peak, which should not include the battery. Right. Even though the battery is Appalachian Power battery. I would think if FERC is sitting here, they should sit there and stand up here and say you get some allocated costs. Well, they didn't do that. You get to spread those costs among the customers and maybe on some imputed basis. But the long and short of it is it's leveling out the peaks with managing Appalachian Power's power. That's exactly what they want to do. And, I mean, they're explicit about it. They talk about it in their petition to the commission. And so this isn't a question.  And I'm going to keep coming back to 318 because I think it's important because it sets up that timing aspect, which is important because, as you said, so let's go back to the timing aspect. It sets up the timing aspect that Appalachian Power has to be providing the power necessary to serve and use customers in real time. And when they're using the battery to do that, they're taking that away. The city itself, which has taken that power at one point and is using that power at a different time, is the one serving at that point, right? It's already taking the power. And why that is important is because, as you talked about, when we start talking about the compensation, the recovery for capital investment, when it comes to the demand charge, which is the charge for fixed capital costs, Appalachian Power has to determine ahead of time how much power the end-use customers are going to need. Because in the summertime in Radford when all the college kids are back and all the air conditions are going and they're at their highest peak, the company has to plan for and make sure it has the generation resources in place to serve those end-use customers. So hypothetically, if at 12, no, let's say 8 o'clock in the morning, I don't know what the low demand time is, but let's say 8 o'clock in the morning, the customer buys all its needs, 100 percent of its needs. And then over the period of the days, a day, it disperses it. And the next morning, then it buys all its needs. You're saying you're not designed for that because, number one, you couldn't produce all the power at one time. You have to produce it over a period of time. And that power demands are low in one part of the day and high in another part of the day, and therefore a requirements contract has to be geared to the timing of the availability of power. That's right. But the question is whether a battery is prohibited. And I thought you relied on the generation resources, and that's what FERC relied on. That clause, what's it, C, 3-1-C? 3-1-C. And you're going to 3-1-A, and my question is, is there something in 3-1-A that it tells the purpose, but does it prohibit the customer from leveling out the peak? So it says during the delivery period, and the point that I didn't get to on 3-1-A, which I should have emphasized, and my time is up if I can finish. And that's my fault. I left off. So during the delivery period, companies shall sell and customers shall exclusively receive and purchase full requirements electric service sufficient to serve customers' retail load except as provided herein. And here there is no sort of demand response or no demand management type of provision in here that would allow that to happen. So what we're saying is that the use of the batteries in the way that the cities are trying to do is what violates this 3-1-A-C. I would also argue we disagree with FERC's determination that batteries are not generation. That's where it gets back to my point, because the battery generates when it discharges, but it degenerates. It's the opposite when it's being charged. And so the argument that FERC makes or the ruling that FERC makes is basically that amounts to a storage facility because it is using Appalachian Power energy to charge it, and then it's using that power and discharging it during peak hours. It's a timing issue. And it does lower the peak, and it does change your cost allocation and collection of rates. But it's an interesting case, and I'm not sure. I guess our standard of review is we interpret contracts as a matter of law, so we look at it de novo, I suppose. That's what we would argue, yes, Your Honor. Would we give FERC any credit for the fact that with respect to discussing power and whether a battery is storage, that that is more of an expertise type of thing, or would we just treat it de novo? I think FERC would argue you should treat it de novo, but I would argue no because you're looking at the terms of the contract here, and that's what you're interpreting. And I would also point you to the way that FERC looked at generation here. It looked at the dictionary generation. To me that doesn't really show any kind of additional kind of expertise beyond that. Generation sort of means producing, and I think the aspect of the battery when it lights a flashlight is producing energy. There's no question about it. But the real question is when the battery is used online as opposed to being if the battery were charged by a solar cell or by the stream in the back of the plant, now you have generation because the source is not Appalachian Power. But in this case, according to FERC, the source of the generation was Appalachian Power, and then the discharge, it was delayed. Anyway, you understand what my thinking was and concern was, and it's a fairly complex arrangement here. You guys can't go out of business, but you've got to help us save electricity. That and, again, I'm well over, but there is a cost causation issue here that FERC didn't address that we raised as a concern below as well. We talked about other customers. You may still be able to raise that, I think. I think you should, when you get out of here by lunchtime, go file a petition on the cost allocation. Thank you, Your Honor. All right. We'll hear from Ms. Banta. Good morning. May it please the Court, I'm Carol Banta for the Commission. There's a lot I want to pick up from the topside argument. My question is, have you already offered them a little bit of adjustment on their plant allocation? Well, no, but let me explain why, because that's a creative idea, and they should perhaps propose that when they're renegotiating this contract, which expires in 2026. I can't offer that, and I don't think the Commission could either, because they didn't bargain for it in this contract. It's not in this contract. Well, their argument on the contract is that the whole contract is designed on real-time consumption of electricity, and that is a graph, and this changes the peak on which its cost allocations are dependent. Well, and the problem for Petitioner, and I do want to get to the ways that they could still seek what you're discussing. The reason I can't offer it, and I don't think the Commission could have in this proceeding. I wasn't seriously requesting you offer it. I thought it seemed to me that there doesn't need to be hostility between the parties. There ought to be accommodation, it seems to me. Well, and they certainly could attempt to renegotiate with these customers. They could attempt to renegotiate this contract, but again, it does expire in a couple years, and there will have to be, if they're going to continue service at all, some new contract that they can negotiate. They can negotiate the Virginia Tech language. They can negotiate something like what you're suggesting, but on the terms of this contract, the Commission said you have the freedom to make a bad bargain or a bargain that you're not happy with, but that doesn't mean we have the ability to read terms into the contract. I think it was unforeseen at least, not totally, because a Virginia Tech contract has the battery language. And batteries certainly, battery storage by 2017 was being used for things like this. It was a known, this isn't a 20-year-old contract where no one could have known. Oh, and I do want to address briefly, I don't want to jump around too much because I'll lose something. I pulled you off track. Oh, no, no. Because I do want to discuss your concept of batteries a little bit. But going back to the point about what they negotiated and interpreting the contract that they negotiated, you know, these were sophisticated players. That doesn't necessarily mean that they're both happy with the terms of the contract, but the Morgan Stanley decision from the Supreme Court says that when sophisticated parties negotiate an arm's-length contract like this, it is presumptively just and reasonable, and it will be treated as such unless and until it is shown not to be just and reasonable. They could bring a complaint proceeding saying this contract is not just and reasonable and must be reformed under the Federal Power Act. That wasn't this proceeding. This was just interpret the contract, a declaratory order interpreting the contract as it is. Now, it's true that were they to bring a complaint that the contract is not just and reasonable, there is a very high bar. Morgan Stanley talks about that. But the fact is that's a proceeding that exists. So it's not that there's no possible way to get yourself out of a contract that has become, you know, extremely unjust and unreasonable. Just that was never this case. This was interpret the contract on the terms that it is. And just a brief note on the standard of review, I do think the commission can be affirmed under any standard, but I would point out these are not just private commercial contracts. As I was saying, Morgan Stanley discusses these kinds of contracts. They discuss contracts entered under market-based rate authority. But those are still contracts that exist by dent of FERC approval, even if the commission didn't specifically approve this contract. It approved the market-based rate authority without which this contract would not exist. So these are not simple private commercial contracts. They are contracts that have what I believe, if I've got the right case, was Cajun Electric referred to as a public interest gloss. And those are the kinds of contracts that deference to the commission, even when the expertise isn't brought to bear on the contract, although we think it was. What's the principle for that? The principle for that is and it. It sounds to me like it's sort of an extended Chevron type of thing, which Chevron, of course, did statutes and regulations and maybe an approved contract is regulatory. But I'm not sure I'm aware of Chevron being applied to contracts. Well, it has been, but this does not depend on Chevron. As we discussed in our supplemental brief, it goes to cases that long predate Chevron. And the key ones from this court was the seminal case of consolidated gas, which was very influential on the D.C. Circuit, in particular in national fuel. And in national fuel, which postdated Chevron, the D.C. Circuit said, okay, you know, Chevron has something to say about this, but there are reasons that we've been deferring and should be deferring on contracts that have nothing to do with Chevron. And it talked about, for one thing, there's an explicit delegate at 1569, page 1569 in the national fuel decision. It talks about an explicit delegation to FERC as opposed to an implicit one, as in Chevron. But it went on to talk about two particular reasons why deference to agency interpretation of contracts is appropriate. One was the expertise, but not just limited, again, to expertise, where it's brought to bear on this contract, although in this case I would argue that it was. But that there's language in national fuel, and it goes back citing cases like, I forget what they say in national fuel, that talked about the agency having expertise in this field of enterprise, just being familiar with these kinds of contracts because we see them all the time. But the second thing that national fuel discussed was also that these contracts are special because they wouldn't exist without Federal Power Act authority. They aren't ordinary commercial contracts. They are, I don't have all the cases in my head, but they're all in our supplemental brief. We're talking about how these contracts have a public interest gloss to them, that they are almost like a commission order. They're elevated to something beyond ordinary private commercial contracting because they would not exist without FERC authority. Just getting more detailed, could Appalachian Power have gone into a Federal court and sought a declaratory judgment? Well, under the contract, I think their alternative was Virginia State Court. Now, could they get a declaratory order being essentially an advisory opinion on what the contract means before there's a breach? I don't know. They'd have to allege a legitimate dispute with the customer. But I'm assuming that, and I don't know if the standard for declaratory order from the FERC is different from a state declaratory judgment. But my question is, could they have gone? I'm raising that simply to question how much your argument carries because if they could do that as an alternative. Well, let me tell you what might happen in that case. And I had a case which we cited in passing in the brief called Fairless in the D.C. Circuit, where there was an argument about a breach. And someone went to state court in that case. And the other party came to FERC with a request for declaratory order about what the contract meant. And the commission, as here, exercised its primary jurisdiction. Now, that's discretionary. It doesn't have to. Sometimes the commission can say, we don't see a need for us to speak to this. Go on with your state court action because we do have concurrent jurisdiction. But in this case, as in Fairless, as in the North Carolina Eastern case that was the Duke Energy Progress case on appeal, the commission said, no, this is one where we think our expertise is involved and the other parameters of our own test for primary jurisdiction, like the need for uniformity and the importance to our regulatory responsibilities. We're taking primary jurisdiction. So what happened in that case is in Fairless, the Texas court, I believe, put the case in abeyance because the court was going to pay attention to what the commission said. So, yes, there's concurrent jurisdiction to go to a state court or perhaps a federal court. But when the commission exercises its primary jurisdiction, it still matters. And the court is probably either going to defer to it or pay attention to what the outcome is. And that's what happened in the Fairless case. I still don't understand how the commission has any more expertise in interpreting the terms of a contract than the court does. Well, because we see these full requirements service contracts all the time. And this is actually a recurring issue, the role of battery storage in full requirements contracts. We have this case in the North Carolina Eastern case. There's a more recent case that's still working its way through the commission that we recently issued an initial order on. So it's that it's a kind of contract that we're familiar with because the dispute here doesn't entirely turn on the definition of generation. The commission actually looked at three different aspects here. It was the definition of generation. It was the exclusivity requirement that your sole provider be Appalachian and that you not make purchases. Well, that's inherent in the prohibition. It says it prohibits external generation. But it says it in several places, including 3.1a that Mr. Kaiser was pointing to. The customer shall exclusively receive and purchase. So the exclusivity was important, and that's where the commission went into the analysis of the fact that the batteries would be charged using Appalachian's power, not someone else's. I would suggest even under the generation clause that if the battery were charged solarly, by solar or by some kind of stream flow, a windmill or something like this, that that would be introducing a new generation of power.  Because you're converting either the whatever the source of the charge is. But here the charge was done by Appalachian's power. Appalachian power in, Appalachian power out. And the only thing I wanted to say, I liked your rain bucket analogy earlier, except that the rain's coming entirely from Appalachian's filling the bucket. And that's the thing. The kind of batteries you have in your flashlight are a little different, but if you were to buy the rechargeable ones. Well, a flashlight would indicate the opposite. Your first indication is, well, your opinion used the word storage. And that took me back because I thought a battery generates electricity. It does. And you light a flashlight and it produces electricity to provide the light. But think about if you buy rechargeable batteries for your flashlight. It's used here in the system, in a stream where the charge comes in.  Anyway, you understand what I was arguing with him. The battery in your car, we're used to batteries not just being, I honestly don't know how your standard alkaline battery works, but a rechargeable battery, you plug it in, Appalachian power fills it, and you put it in your flashlight. So it doesn't, and what you're talking about, like solar, wind, those are producing. This is very much dispensing. It's about dispensing. If it were not rechargeable, then it's a chemical source. Yeah, it would be some kind of generator at that point. Well, let's change the subject to the elephant in the room. You were supposed to apply Virginia law, and it appears you did not, but you did a post hoc rationalization about it. Can we buy that argument? Yeah, two answers to that. One, we did not provide any rationale that the commission didn't. All the canons of construction that we discuss in our brief are cited in the order, but let me point to an important case, which the petitioners actually cited. There's a Fifth Circuit case called Pennzoil that they cited that said that the commission has to apply state law and not general principles. What Pennzoil says, and let me give you two sites, because there are two Pennzoil cases, and this is very important. 789F2nd at 1142, and then the predecessor Pennzoil case at 645F2nd at 387. What the Fifth Circuit said in that case is that the commission can assume that general contracting principles apply, and if there's a difference in the state law, you have to point it out. The commission is fine with applying general principles of contract law unless you point out to them that state law is different. Well, they haven't. They still haven't. There's nothing in Virginia law that there's any evidence in this, or not evidence. There's no briefing in this case that anything in Virginia law differs from the general canons of construction that the commission applied. So in our brief, when we did supply Virginia citations, they were only for rationale that the commission had already offered in its cases about you can make an improvident bargain, in its cases about Barnhart v. Peabody Coal, that's the United States Supreme Court. The canon espressio unius, etc., does not apply to every statutory list or grouping. Well, I mean, is there any limiting principle to the notion that FERC can just interpret contracts within its jurisdiction under any law it chooses? Well, it applied general canons of construction. Is that your limiting principle? Well, yes, because if Virginia has a canon that differs from these, which we don't see any reason to think it does, because all the Virginia cases we've looked at, they're the same canons as applied here. But under the Pennzoil case that Petitioners themselves cited, you have to say to the commission, hey, that's not what the principle is, because Virginia has a different way of applying espressio unius, but it doesn't. So that's the limiting principle if there's some difference. They have to point it out to you? Yes, and they didn't point it out to the commission, and they haven't pointed it out to this court. They don't like the outcome of this, but they haven't pointed to any respect in which the Virginia canons of construction. And again, the cases from Virginia talk about espressio unius the same way. The opinion is going to be written by this court, and we say what you did here is fine. You just applied the general principles, and if it gets published then other courts are going to look at it. So I guess my question is do we have to draw a line or just let it ride? I think the Fifth Circuit did it twice in both Pennzoil cases, and it was pretty clear. And, yeah, the commission deals with nationwide issues, and it is familiar with the general canons of contract construction, but certainly, and it's done this in a number of cases. In the Fairless case that I had, it would have been Texas law, but nobody pointed out that we got anything wrong under Texas law because the principles were the same. There's a different choice of law in any one of these contracts, but you have to tell the commission, hey, Virginia doesn't apply that one that way. It sounds to me like it's a burden issue you're saying, but I would think that it could go both ways because the appellation could be relying on some general principle of contract law for its interpretation, and you could be saying, but that's not consistent with Virginia law. Well, yeah, if we had reason to think that they were arguing something and they were wrong about it, sure. It depends on how it arises, but it seems to me either party could challenge. I mean, general contract principles are fairly understood. I mean, basically you're going after the intent of the party here. It's a law binding the party's arrangement. Either party. Either party could say, yeah. But I would think the principle you've cited could be flipped, whereas you're objecting to their generalized interpretation of contract law because Virginia has an exceptional or more narrow application. Right, and one of the parties too. And you're saying in this case nobody has raised it. Either side has raised a question of whether Virginia law is distinct from general contract law. That's right. I mean, these were pretty well-established everywhere principles. Let me make sure that you have time to respond to counsel's argument that a particular section of the contract requires the purchase of peak needs at the moment of the peak need. Well, it does not. I mean, the commission said there's no provision for a minimum purchase or a minimum peak obligation. And the language I think that they're pointing to, that he's pointing to. They're pointing to 3.1a. Yeah, 3.1a. It says you shall exclusively receive and purchase. And we've addressed the exclusivity. And it says full requirements electric service. And so I believe my friend is pointing to the definition of full at 1.23. Now, I had tied up the Craig Botetourt contract rather than Radford, so I'll give you JA32 on that. Full requirements electric service means the supply of firm energy to be provided at the delivery points. We're talking about the meters. So we're talking about the power being delivered to the meters, not what's going on with the batteries behind the meters. You're delivering to the meters to charge the batteries because the batteries are behind the meters. And it may fluctuate in real time to serve customer's retail load. And it may fluctuate in a number of ways, which the commission discussed in the order, including increased or decreased usage. Now, here it is more of a timing issue than a usage issue. We do have what amounts to decreased usage, but it really is, I think we all agree, a timing issue because the Appalachian Power is going into the battery and nothing is coming from the battery that didn't go into it from Appalachian Power. So there's nothing in here that prescribes the timing. The commission didn't see it that way. I'm not sure it was even – never mind. And if we go from full electric requirements service to at 1.23, and we go to the next page to look at retail load at 1.45. And again, we're talking about metered at the delivery points. And it's to meet the requirements of the customer because here the customer is the city or the cooperative. It's not the end users. It serves those end users. But to meet the requirements – but it doesn't say when. It doesn't say it has to all be at once. So that timing thing wasn't here. And again, the commission pointed out in footnote 55 on JA363 in the order, the Virginia Tech Agreement, which granted comes later, shows that you can bargain for language to cover that. You can bargain for language to address a timing issue. And they didn't in this contract, and they're sorry that they didn't. And I'm sure they'll try to include something like that next time when they negotiate it. But the commission, again, applying general canons of construction, is not going to put words in that aren't there because one party wishes that they had included them. And we cited the cases for that in our brief. We can't read it in just because they're sorry it's not there. It's not there. Virginia Tech Agreement shows that it could be there. If you want to put it there, you can negotiate for that language and get it. What was the chronology of the agreement? Is the Virginia Tech the first agreement or the last? The last. It is the last. The first three agreements are all within a two- or three-month period in 2017, and the Virginia Tech Agreement is 18 to 20 months after those, 20 months after the first ones and 18 months after the last one. Well, it appears they figured it out. It does appear that they learned some lesson that they wish they had known. Well, they allowed battery, didn't they, for Virginia Tech? With a hard cap and a limit on when it could be. The timing issue. The timing issue. I would think that that may become, or they could even do some other aspect so that they're participating in the lowering of peaks but yet collecting enough to cover their plant. You can negotiate. Oh, no, I know. It has to be designed in good faith. I think just going back to Judge Bell's question, I'm looking at the definition of 1.23. And it says full requirements electric service. And that sort of supports the argument that Appalachian was making that as it may fluctuate in real time to serve customers' retail load. And so I think his argument is that the sale is not a static sale of the quantity, but it's a sale of the quantity at a given time. It says in, let's see what it says. It means a supply, full requirements electric service means a supply of firm energy to be provided by the company to the customer at the delivery points as the same may fluctuate in real time to serve customers' retail load. Right. And I would point to that. And, of course, the other side is that the load is being adjusted by the battery, which was their power. If I could just pick up on that, both that language and the language in 3.1C, in the Craig Botetourt, it's J36. Actually, the relevant language is J37, that there can be changes in retail load arising from, and it lists a few kinds of fluctuations. And the commission specifically addressed this in, for one place is paragraph 33, which is from JA363 to 64, where it says the agreements don't include any term. Oh, wait, okay. So at the top of JA364, the agreements recognize that the customer's retail load may change and contain no limitation on how the customers can effectuate such variation. And the commission found that important. That was the third thing I said the commission looked at. It looked at generation exclusivity. And then it went on to say, are there terms in this contract that limit your ability to effectuate fluctuations? And there just aren't. And that's why the commission interpreted the contract the way it did, for those three reasons. But the third one's very important, where it looked through the contract to see, are there minimum purchase obligations? Are there timing, like minimum peak obligations? Are there any limitations on how the customer, meaning the city or cooperative, or Virginia Tech in that agreement, but in these, the city or cooperative, can effectuate the variation? And it just isn't in there. And it could be. You could bargain for it. But this contract, as it is written, it's not in there. And that's what the commission concluded. You've gone through a red light and didn't get a ticket. I'm sorry. All right. Mr. Kaiser. Thank you. Thank you, Your Honors. A couple of points on rebuttal. First, I just want to clarify, just to make clear, and it may have been unclear, that when I talked about the standard of review that we believe applies, we believe it's de novo. And so I know I went on a little bit, but I don't know if that came across. The other thing I want to talk about, counsel for the FERC mentioned that talking about storage being available at the time and it wasn't put in this agreement. And I would argue that that cuts both ways, right? So in the Virginia Tech agreement, and this is something that Commissioner Danley cited in his dissent, that storage was available, it was known. The fact that it isn't in here as existing generation, as it was defined in that agreement, the Virginia Tech agreement, means that the parties didn't intend to have it in here, right? And that's why we keep coming back to 3.1a. That's a pretty good argument, except that I don't know how you look at other contracts and imply that in a given contract. I mean, they're at different times and with different parties, with different needs and circumstances. And it could be a very complex decision as to why you allowed it to Virginia Tech and not otherwise, or allowed it. And that doesn't seem to carry too much. I think we should stay with the contractual language here, don't you think? I agree with you. What I would refer you to, when you're talking about 3.1c, what we're talking about, and you actually should look at 4.6a as well, because what we're talking about are the types of load-reducing vehicles available that could impact the power that's being taken by the customer. And so we're talking about existing generation in c, we're talking about power purchase agreements in c, and then if you look at 4.6a, we're also talking about less the capacity provided to customer by SEPA. Sorry, I'm jumping around. That's at JA108 and JA101. So what the contract does contemplate is, what were the parties considering at the time that would be used in a way that would substitute power from the power taken by Appalachian Power? And so we've got the existing generation. You go back and you interpret the battery electricity supplied at peak hours. The argument is that is Appalachian Power, because it was put into the battery by Appalachian Power's energy and was sold at the rates then applicable. The difficulty is cost allocation, because you purchase it in off hours at a lower price than you purchase it at peak hours. And your facilities are created for peak hours, and if you reduce all the peak hours, then you now have a larger facility than you need. And if you reduce it, you may not have enough. I mean, I understand some of these problems. I don't understand them fully, but I understand the points you're making. That still raises a question. The question is the operative language is directed to whether this is an exclusive supply contract and whether that was satisfied. And the question then is whether a battery violates the exclusivity aspect. And the exclusivity aspect seems to be defined in 3C, but 3-1-C, and you're saying it has to be informed by 3A and 4-6. 3A, but you can't lose sight of the two definitions that I highlighted, because those are important, right? When we're talking about full requirement services, it's a supply of energy, but it's supplied at real time, and it's to serve customers' retail load. 1.23, whatever. 1.23, that is correct, and that's a JA-96. The other thing that I don't think we can lose sight of is 1.45, which defines retail load. And counsel for the commission was talking about how there can be fluctuations in the contract, but those are fluctuations by the end-use customers and retail load. So we have to serve retail load in real time, and retail load is defined by the customers, in this case the city's end-use customers. And at the time of peak, when you're using that battery to fluctuate the power that's being taken from the company, you're not fluctuating the end-use customers' use. They're still using the same amount of power. We're just not supplying it at that time. And so that at that time, and that's a critical point, because we need to make the investments necessary to be able to serve it, serve all the needs at that time, whether or not those batteries exist. I'm out of time. Thank you. All right. We'll come down and greet counsel and proceed on to the last case.
judges: Paul V. Niemeyer, Henry F. Floyd, Kenneth D. Bell